60

CHARLENE KIM CARR,                : Case No.: No. B-97-245

Plaintiff,                        :
                                  : IN THE UNITED STATES DISTRICT COURT
        Vs.                       : FOR THE SOUTHERN DISTRICT OF TEXAS

ROBERT E. RUBIN, SECRETARY OF THE :

DEPARTMENT OF TREASURY FOR THE UNITED :

STATES and THE UNITED STATES OF   :

AMERICA,                          :

Defendants                        :

_____

United States District Court
Southern District of Texas
FILED

JAN 3 0 2001

Michael N. Milby
Clerk of Court

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Charlene Carr hereby moves the Court pursuant to Federal Rules
of Civil Procedure (12)(b) to deny the defendant's motion for a
summary judgment for all claims in defendant's third motion to
dismiss.  As fully demonstrated below and accompanying
memorandums and exhibits, plaintiff has competent and compelling
evidence that supports every element of her claims against the
named defendants as to demonstrate that there are genuine issues
for trial. In accordance with Federal Rules of Civil Procedure
(12) (b), if factual disputes exist, the motion of summary
judgement must be denied.

Charlene Carr respectfully submits that defendant's motion for Summary
Judgement is without merit and should be denied for the following reasons:

- 1

CitePDF - www.teslia.com

### STATEMENT OF MATERIAL FACTS

The following facts are proven by competent evidence in the record.

On November 20, 1989, in Brownsville, Texas, Charlene Carr, ("Plaintiff" or "Ms. Carr.") began work as an employee of the United States Government, working for the Department of Treasury-United States Customs.  On September 16, 1993, while performing her job duties as a customs inspector, plaintiff, Charlene Carr, was approached from behind by Defendant, Gustavo Saldivar, senior custom inspector, who was in possession of a weapon, and unexpectedly detained her in a chair, and kissed her with such force that he bit her bottom lip.  Ms. Carr retreated backward in an effort to escape from his hold but was unsuccessful in her efforts and released only after defendant, Saldivar, committed the unwarranted act.  Ms. Carr was horrified by this act. She jumped up from the chair and ran to the restroom still fearing further harm from the named defendant.  Ms. Carr did not consent to this unwelcome act. See Saldivar's <u>Affidavit</u>. P.1

The following day, On September 17, 1993, Plaintiff, Ms. Carr, reported this incident to her supervisor, chief inspector, Eutemio Rudedas, who was acting port director, and he replied, "this is just an allegation." Ms. Carr was upset by his lack of concern and informed Mr. Eudedas that because of the defendant's Gustavo Saldivar's actions and her fear of him, she could not work in the same port with him. Ms. Carr requested medical treatment and from any further contact with the defendant. Both requests were denied.  Ms. Carr continued to work with the defendant although she was in constant fear that

1  another attack would occur or that the defendant would retaliate against her

2  for filing a complaint against him. Ruedas, Affidavit, p.1

3

4  Upon returning to work from two scheduled days off, Ms. Carr encountered,

5  defendant Gustavo Saldivar, who again unexpectedly approached her in attempt

6  to shake her hand.  Ms. Carr became uncontrollably upset, shaking, and

7  confused as to why the defendant would approach her again, especially, after

8  filing her complaint.  Ms. Carr immediately reported the incident again to

9  chief inspector, Eutemio Ruedas, also present in the office that day, was

10  port director, Jorge Flores, who witnessed her complaint.  Ms. Carr, in fear

11  of her safety, again requested a transfer from that port location. Ms. Carr's

12  request was denied. Rudas, Flores Affidavits, p1

13

14  On September 28, 1993, Geneta Cornelius, EEO Counselor with the U.S. Custom's

15  Department of Treasury, interviewed Ms. Carr in reference to her complaint

16  against defendant, Gustavo Salidvar.  In that interview, Ms. Carr expressed

17  her fears of working with defendant Saldivar and the impact this had on her

18  work related mental condition. Ms. Carr again requested a transfer and her

19  request were denied. Ruedas, Affidavit, p.1, Flores, Affidavit, p 1-3

20

21  In the meantime, the defendant, Gustavo Saldivar, told other employees about

22  the incident, and falsely suggested that Ms. Carr sexually assaulted him. He

23  solicited letters of support on his behalf.  This action caused Ms. Carr to

24  suffer embarrassment, humiliation, fretfulness, loss of appetite, isolation

25  from other staff members, anxiety attacks, intrusive thoughts and memories.

In addition, other employees and certain superiors of which included her

- 3

CISPDF - www.texiu.com

1   direct supervisor treated Ms. Carr very rudely.  This rude treatment had not

2   happened before September 17, 1993, the day, Ms. Carr filed her complaint

3   against defendant, Gustavo, Saldivar.  During this time, Ms. Carr suffered

4   extreme emotional distress, and on many occasions was mentally unable to

5   report to her assigned duties.  She exhausted her sick and annual leave

6   ultimately being forced to take leave without pay.  Ms. Carr was counseled

7   about her poor attendance record and warned that her actions were not

8   acceptable to the employer and could result in disciplinary action for a

9   violation of the employer's sick leave policy. Flores, _Affidavit_ p.2.

10

11  In January 1994, unable to cope with her mental condition, Ms. Carr sought

12  professional psychological care. Her physician diagnosed her condition as

13  work related depression and prescribed her medication to assist with her

14  condition.  After she returned to work Ms. Carr's superiors held her to a

15  higher standard than other workers and oftentimes, u unjustly accused her of

16  policy violations.  Because of this unfair treatment from her superiors, Ms.

17  Carr's mental condition escalated to a more severe condition.  Ms. Carr again

18  requested a transfer and her request were denied.  Ms. Carr's superiors told

19  her that if she dropped the charges against defendant, Gustavo Saldivar, they

20  would honor her transfer request.  Ms. Carr felt insulted, belittled, and

21  emotionally distraught at their offensive request and lack of concern for her

22  safety and medical condition. .

23

24  In March 1994, after many uncomfortable encounters with defendant, Gustavo

25  Saldivar, Ms. Carr was transferred to a less desirable port location at her

    own expense.  At this new port location, Ms. Carr had less to do and was not

learning as much as she did at her previous port location and she could not

fairly be evaluated.  Consequently, Ms. Carr could not be fairly considered

for advancement and other opportunities that required more on the job work

experience.

Ms. Carr repeatedly requested job transfers to a port location with more

challenging duties and potential for advancement.  Ms. Carr sought those

positions in her areas of qualifications at a higher grade and with more

compensation. Her superiors refused to give her consideration for those

positions although she had received favorable evaluations and merit increases

before September 16 1993.

On October 23, 1994, Ms. Carr wrote the defendant's management department

requesting a job transfer because she feared that harm would occur at this

new location and her request was denied.

In the fall of 1994, Ms. Carr requested and was granted a medical leave of

absence because of extreme depression.  Her depressive state developed as a

result of the work-related assault, job transfer and the hostile treatment

she received from co-workers and her superiors. Before her leave of absence,

Ms. Carr's work performance was highly scrutinized by management who also

discouraged other employees from any affiliation with Ms. Carr because of her

accusations, against, defendant, Gustavo Saldivar

While out on medical leave, Ms. Carr did not receive any wages or other form

of compensation for her work-related injury for approximately five months.

CibPDF - www.fasite.com

1

2  Ms. Carr was examined by Carlos Estrada, a medical doctor employed with the

3  United States Government, who upon his evaluation of Ms. Carr, recommended

4  that she be transferred immediately from her work environment. His

5  recommendation went ignored and Ms. Carr was forced to return to work at her

6  same port location in October 1995.

7

8  In October 1995, after Ms. Carr returned to work she received the same harsh

9  and unwelcome treatment from her co-workers and superiors as she had before

10 her leave of absence.

11

12 On October 23, 1995, Ms. Carr was unexpectedly approached and touched by

13 Domingo Tamez, Jr., a Canine Enforcement Officer.  Ms. Carr did not consent

14 to this touching.   This incident was immediately reported to Ms. Carr's

15 superiors and again her complaint was not taken seriously by her superiors.

16 The assault further exasbated Ms. Carr's medical conditions, which left her

17 mentally unable to work and again forced to take, leave without pay. Tamez,

18 Affidavit, p.160

19

20 After this incident, Ms. Carr applied for medical benefits under the Officer

21 of Worker's Compensation/U.S. Department of Labor laws. This request was

22 denied based on fraudulent information supplied by Ms. Carr's supervisor,

23 Maria E. Reyes, who reported no prior knowledge of the October 23, 1995,

24 assault incident.  This information was in contrast to Domingo Tamez, Jr.,

25 affidavit, whereas he stated that he reported the incident to Maria E. Reyes,

   on October 23, 1995. Tames, Affidavit, p.160

CVisPDF - www.texisi.com

1  Ms. Carr was left financially destitute for the next two years until she was

2  awarded social security benefits for a work related mental disability that

3  left her jobless and loss from future earnings. Tamez, _Affidavit_, p.160

4

5                                    I

6  DEFENDANT, DEPARTMENT OF TREASURY FOR THE UNITED STATES, IS NOT ENTITLED TO

7  SUMMARY JUDGMENT ON PLAINTIFF'S, CHARLENE KIM CARR'S, CLAIM UNDER RULE 12(B)

8  The Department of Treasure is seeking a remedy that is disfavored in the law,

9  although, the defendant's counsel fails to acknowledge such fact.

10

11  b.    Plaintiff's Claim of Hostile Work Environment was Extreme or Severe or

12        Pervasive such as to Alter the Terms and Conditions of Plaintiff's

13        Employment.

14

15        In the present case, Plaintiff's claims do rise to an actionable level

16        as defined under Title VII.

17

18        In sex discrimination cases, the court recognizes that workplace

19        harassment may take either of two forms.  It may consist of promises of

20        favorable treatment or threats of unfavorable treatment calculated to

21        coerce an employee into submitting to unwelcome sexual advances (Quid

22        pro quo harassment), this concept is also applied to hostile

23        environment harassment. Daniels v. Essex Group. Inc, 937 F.2d 1264

24        (1991), Johnson v. Teamsters Local Union No. 559, (1995).

25

A successful hostile work environment claim under Title VII is made
when the plaintiff establishes that the workplace is permeated with
discriminatory, intimidation, ridicule, and insult that (are)
sufficiently severe or pervasive to alter the conditions of the
victim's employment and create an abusive working environment.  "Harris
v. Forklift Systems, Inc. 510 U.S. 17, 114 (1993)

In Briones v. Runyon, 1996 U.S. App. (1996), the circuit court held to
prevail on a hostile work environment claim, Briones must show: "1)
that (his) workplace was permeated with discriminatory intimidation
that was sufficiently severe or pervasive to alter the conditions of
(his) work environment and 2) that a specific basis exits for imputing
the conduct that created the hostile environment to the employer. "Van
Zant, 80 F.3d at 715.  Additionally, because the alleged harassment is
attributable to a co-worker and not a supervisor, Briones must
demonstrate that the Postal Service "either provided no reasonable
avenue for complaint or knew of the harassment bud did nothing about
it."


In the case at bar, the evidence shows that on September 16, 1993,
during work hours, defendant, Gustavo Saldivar, senior custom
inspector, who was in possession of a weapon, unexpectedly approached
plaintiff Charlene Carr detained her in a chair, and kissed her with
such force that he bit her bottom lip.  In Lattimore v. Polaroid
Corporation, 19 U.S. app. (1996), the court held that workplace
harassment includes unwelcome sexual advances.  Here, the evidence
shows that the plaintiff did not welcome this conduct and as such, the

- o

defendant's conduct qualifies as an unwelcome sexual advancement in
violation of Title VII.  Ms. Carr immediately reported this incident to
her superiors, who did nothing to safeguard her safety. The defendant
alleges that after learning of this incident, defendant, Gustavo
Salidvar was suspended for two days without pay. No such action
occurred until after Ms. Carr transferred to a separate location,
forcing Ms. Carr, to work more than five months alongside the
defendant.  The defendant's actions, unequivocally, shows that they
lacked concern or interest for Ms. Carr's welfare and safety.  In fact,
Ms. Carr requested several port transfer and each of her request were
denied without any rational basis for such denials which left her with
no other alternatives but to work with her attacker in a hostile and
feared work environment. This fact shows that the defendant's actions
were sufficiently severe enough to alter Ms. Carr's condition of
employment and create a hostile work environment.  Furthermore, there
is also supporting evidence to establish that defendant Gustavo
Salidar's continued to make harassing advancements towards Ms. Carr
even after her initial complaint was filed.

The defendant claims that Gustavo Salidar's act was an isolated
incident, their claim lacks merit in this respect, as supported by,
defendant's, Canine Enforcement Officer, Domingo Tamez's, affidavit,
whereas he admits that he touched the plaintiff's back neck area
without her consent, as to qualify as an unwelcome act in violation of
Title VII.  The evidence shows that Ms. Carr again requested to be
remove from the hostile environment and her request was denied forcing

her to remain in a hostile and unsafe environment. Both Defendant's acts qualifies as unwelcome acts and were severe and pervasive as to alter the conditions of Ms. Carr's employment and create a hostile work environment as to be actionable under Title VII.

The defendant further argues that for a claim to be actionable under Title VII, an adverse employment action must be sufficiently significant as to alter the terms and conditions of the claimant's employment. Mattern v. Eastman Kodak Co, 104 F.3d 702, 707-09 (5th Cir. 1997), *cert.denied,* 552 U.S. 932, 118 S. Ct. 336 (1997); Dollis v. Rubin, 77 F. 3d 777, 781-82 (5th Cir.1995). For instance either a discharge or a failure to hire or promote and compensating. The defendant's argument that there was no adverse employment action, sufficiently significant as to alter the terms and conditions of the plaintiff's employment is false. Here, the evidence shows that because of the sexual assault that occurred at the Brownsville Job location, Ms. Carr suffered an extreme mental condition that required extensive counseling and medication to help her with normal routine activities that Ms. Carr enjoyed free of any medical assistance before being assaulted on September 16, 1993. Moreover, Ms. Carr was forced to relocate at her own expense to a less favorable job location with less growth opportunities and under a new supervisor who could not fairly evaluate her work ethics based on her short time at this location. Therefore, Ms. Carr could not be fairly considered for advancement and other opportunities. Ms. Carr repeatedly applied for positions involving duties that were more challenging and offered potential

advancement and she was not fairly considered for these positions.  Ms. Carr was forced to take a medical leave of absence without pay because the defendant failed to timely accommodate her work related medical condition. The evidence shows that for approximately two years, Ms. Carr went unemployed with no medical benefits until she was awarded social security benefits for her work related mental disability.  Prior to receiving her social security benefits, Ms. Carr filed a claim with the Office of Worker's Compensation/U.S. Department of Labor and was denied benefits due to fraudulent information that was submitted by her supervisor, Maria E. Reyes, who claimed no knowledge of the incident in her supervisor's report dated on November 6, 1995 and November 12, 2000. This information was contradicted by defendant's, Domingo Tamez, Jr. affidavit, whereas he stated that on October 23, 1995, he informed Maria E. Reyes, of the assault incident.

The defendant argues that to be actionable an adverse employment action must be sufficiently significant as to alter the terms and conditions of the claimant's employment. For instance, either a discharge or a failure to hire or promote is actionable.  Mattern v. Eastman Kodak Co, 104 F.3d 702, 707-09 (5th Cir. 1997), *cert.denied,* 552 U.S. 932, 118 S. Ct. 336 (1997); Dollis v. Rubin, 77 F. 3d 777, 781-82 (5th Cir.1995). For this reason, the defendant's request for a summary judgment must be denied as there is sufficiently significant evidence that shows that Ms. Carr was discharged from the named employer which altered the terms and conditions of her employment which allows her claim to be actionable under Title VII.

**Accordingly, based on the evidence presented before the court, the defendant's motion should be denied.**

## Conclusion

The defendant's motion for summary judgement should be denied pursuant to Rule (12)(b) of Federal Rules of Civil Procedure whereas summary judgment is appropriate only where there is no dispute of facts and where there exists only one conclusions. "Crawford v. Runyon, 37 F.3d 1338, 11341 (8th Cir. 1994) To the extent that this court must look to matters outside the scope of the pleadings herein, this court should deny the defendant's motion for summary judgment.

CVisPDF - www.texisi.com

1

2

3

4

5

6          Dated this 26th day of January, 2001

7

8          Charlene Carr
           Pro se
9          P.O. Box 105
           Smyrna, GA 30081

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- 13

| AFFIDAVIT | State of TEXAS | County of CAMERON |
|---|---|---|

1. I, GUSTAVO SALDIVAR ~~~~~~~~~~~~~~ (employed by U. S. CUSTOMS SERVICE
(If employed by agency involved in complaint)

2. as (Title and grade of position) GS-1890-11 (SENIOR INSPECTOR) ~~~~~~,

3. state: PRESENT FOR THIS INTERVIEW WAS UNION PRESIDENT WALTER HOWELL.

4. IN SEPTEMBER OF 1993 I WAS A GS-1890-11 SENIOR INSPECTOR AND CURRENTL'

5. I HAVE THE SAME GRADE AND TITLE. STARTED WITH CUSTOMS IN SEPTEMBER OF

6. 1981 AS A CUSTOMS AIDE. IN 1983 I WAS PROMOTED TO AN INSPECTOR AND

7. HAVE BEEN HERE SINCE. MY GENDER IS MALE, I HAVE NEVER BEEN INVOLVED IN

8. ANY EEO COMPLAINT PROCESS. WORKING AT THE AIRPORT 4-12PM SHIFT, SHE WA

9. WORKING 9-5PM. I CAME IN TO RELIEVED SENIOR ~~INSPECTOR~~ INSPECTOR REYES MENDOZA

10. WHO WAS WORKING 8-4PM. MS. CARR AND I WERE THE ONLY TWO INDIVIDUALS

11. IN THE OFFICE. NO ONE ELSE WAS AROUND. MS. CARR WAS INPUTTING CF-178's

12. INTO THE COMPUTER AND I SAT BESIDE HER. MS. CARR TURNED AROUND AND SA:

13. "YOU HAVE VERY BEAUTIFUL TEETH!" AT THAT TIME I SAID "DO YOU WANT ME

14. TO BITE YOU!" SHE DID NOT SAY ANYTHING TO MY COMMENT, SHE JUST SMILED

15. AND CONSEQUENTLY I GAVE HER A SMALL BITE ON HER BOTTOM LIP. AFTER THE

16. FACT MS. CARR DID NOT PUSHED ME AWAY NOR SHOWED AND SIGNS OF BEEN UPSET.

17. AS I PULLED AWAY SHE SAID I HAD LIP STICK ON MY TEETH AND SHE CONTINUE

18. TO WORK ON THE COMPUTER. WE CONTIUNED CONVERSING AFTER THE INCIDENT.

19. THE INCIDENT HAPPENED AROUND 1610 HRS. WE HAD A CONVERSATIONS ABOUT

20. HER PARENTS COMING IN FROM SAN ANTONIO, TX. FOR THE WEEKEND. SHE LEFT

21. THE OFFICE A LITTLE BEFORE 1700 hrs. TO GO CHANGE CLOTHING IN THE

22. BATHROOM, BECAUSE SHE HAD AN APPOINTMENT IN McALLEN,TX. BEFORE SHE LE

23. SHE MADE A PHONE CALL. ONE TIME I HELPED HER MOVE AND IT WAS AT THIS

24. TIME THAT I MAY HAVE CALLED HER BUT THAT IS IT. THE ONLY TIME I SEE

25. MS. CARR IS AT WORK AND AT OWER CUSTOMS FAMILY PARTIES. THE ONLY TIME

26. _____

**48**

27. Page 1 of 3 pages          Deponent's Initials: ~~~~~~

**Official Supervisor's Report:  Please complete information requested below:**

**Supervisor's Report**

**17. Agency name and address of reporting office (include city, state, and zip code)**

U.S. Customs Service

International Bridge

Hidalgo TX

Zip Code 78557

OWCP Agency Code 2712CU

OSHA Site Code

**18. Employee's duty station (Street address and zip code)**

International Bridge   Hidalgo, TX          Zip Code 78557

**19. Regular work hours**  From 8 00 ☒ a.m. ☐ p.m.   To 10 00 ☐ a.m. ☒ p.m.

**20. Regular work schedule**  ☐ Sun. ☒ Mon. ☐ Tues. ☒ Wed. ☒ Thurs. ☒ Fri. ☐ Sat.

**21. Date of injury**  Mo. 10  Day 23  Yr. 95

**22. Date notice received**  Mo. 10  Day 23  Yr. 95

**23. Date stopped work**  Mo. 10  Day 23  Yr. 95   Time: 1:00 ☐ a.m. ☐ p.m.

**24. Date pay stopped**  Mo.  Day  Yr.

**25. Date 48 day period began**  Mo. 10  Day 24  Yr. 95

**26. Date returned to work**  Mo.  Day  Yr.   Time:  :  ☐ a.m. ☐ p.m.

**27. Was employee injured in performance of duty?**  ☐ Yes  ☐ No  (if "No," explain)

Unknown, I have no knowledge of this incident other than employee's statement nor was I a witness to the incident.

**28. Was injury caused by employee's willful misconduct, intoxication, or intent to injure self or another?**  ☐ Yes (if "Yes," explain) ☐ No

Unknown. I have no knowledge of this incident other than employee's statement nor was I a witness to the incident.

**29. Was injury caused by third party?**  ☐ Yes  ☐ No  (if "No," go to item 31.)   Unknown

**30. Name and address of third party (include city, state, and zip code)**

Unknown, I have no knowledge of this incident other than employee's statement nor was I a witness to the incident.

**31. Name and address of physician first providing medical care (include city, state, zip code)**

Dr. Brigoyen, 6th Street, McAllen, Texas

**32. First date medical care received**  Mo. 10  Day 23  Yr. 95

**33. Do medical reports show employee is disabled for work?**  ☐ Yes  ☐ No   Unknown

**34. Does your knowledge of the facts about this injury agree with statements of the employee and/or witness?**  ☐ Yes  ☐ No  (if "No," explain)

I have no knowledge of this incident other than the employee's statement.

**35. If the employing agency controverts continuation of pay, state the reason in detail.**

**36. Pay rate when employee stopped work**  $  Per

**Signature of Supervisor and Filing Instructions**

**37.** A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of fact, etc., in respect of this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception: I certify only my statements and those are only true to the best of my knowledge.

Name of Supervisor (Type or print)  Maria E. Reyes

Signature of Supervisor  M E Reyes

Supervisory Customs Inspector

Date 11 06 95

210 843 2281

**U.S. Department of Labor**

| **AFFIDAVIT** | State of   TEXAS | County of   Cameron |
|---|---|---|

I Jorge L.Flores,employed by the U.S.Customs Service as Port Director GS-1890-14 state :That I started in Customs in 1969 as an Inspector. I previously served as union President for appx. seven years while working as an inspector.I was promoted to Supervisory Inspector GS-11 at Progreso Port of Entry,Progreso, Tx. in 1980.I returned to Brownsville, Tx. as a Supervisory Inspector GS-12 in charge of the Contraband Enforcement Team in 1985.In 1987 I was promoted to Port Director GS-12 at Rio Grande City, Tx.In 1989 I was promoted to Chief Inspector GS-13 at Brownsville, Tx. Shortly after within the same year I was appointed to Port Director GS-13 at Brownsville,Tx.In November 1992 I was upgraded to GS 1890-14.I have a Bachelor of Science degree with a double major in Mathematics and Spanish.I served as a Mathematics teacher for two years at Hanna High School prior to working for Customs.

My gender is male.I was aware that Ms Car had filed an allegation of sexual harassment. I became aware when she came into my office and personally informed me of the incident.

I can not honestly arrive at a conclusion of whether sexual harassment did take place as alleged,due to the fact that I have not been privy to the investigative reports from Internal Affairs and EEO, and I have not interviewed Mr. Gus Saldivar.Note:I was advised by Regional EEO to allow EEO and Int. Aff. to do the entire investigation.I don't know all the facts.Ms Carr alleges that she was kissed while it is rumored that Mr. Saldivar bit her on the lip.I have not reviewed the evidence since reports are still pending, and procedures do not allow me to see the EEO findings.Disciplinary action is still pending due to the fact that the investigation reports are still not in.In consulting with LER Spec. (Laredo) Lee Erickson it is advisable to way until all reports from I.A. and all findings from EEO are in.To avoid a double jeopardy situation punishment or disciplinary must wait until all investigations are completed.

Regional EEO Dept.in Houston (Ms. Sally Phillips) was immediately notified on Sept. 20, 1993,the same day that Ms. Carr apprised me of the incident.Ms. Phillips in turn notified Mr. David Garza, Reg. EEO Officer in Charge about my call.Mr. Garza returned my call on the same day and advised me not to open up an investigation.He stated that he would immediately initiate action an appoint Ms. Genita Cornelius, an EEO Counselor to initiate investigation.He advised me not to advise Mr. Saldivar yet, and to let the appointed EEO Counselor do it when she arrived at the Port, immediately thereafter.As suggested by Mr. Garza, if I remember correctly employees were immediately separated.One remained in the Cargo

7. Page  1  of  3  pages
Form 5991-A (Rev. 6-81)                    Deponent's Initials:
Department of the Treasury - Internal Revenue Service

67

| AFFIDAVIT | State of *Texas* | County of *Cameron* |
|-----------|------------------|---------------------|

p.2

section (Ms. Carr) while Mr. Saldivar remained in Passenger Control section.Due to sensitivity of case, only the top chiefs were advised of the problem, for operational reasons.

The complaint from Ms. Carr was articulated by her as follows:I want to file a sexual harassment charge against Insp. Gus Saldivar.While assigned the 4p.m. shift at the Airport Mr. Saldivar kissed me without permission, while I sat next to him typing in the computer.I do not feel comfortable at work, he invaded my personal space, he is a married man and there were no witnesses to the incident.I want to go formal and I am going to notify internal affairs. She said she was under stress. Note:At this point I offered her assistance by advising her that she could utilize the FTS phone lines and call a U.S. Customs Employee Assistance Counselor at Washington D.C. and provided her with the telephone number. I further advised her that she could even request a male or female counselor.I believe she said I want to be transferred out, but I am not sure if she asked for it or not.

On 9/23/93 I received a call from Attorney Dan Frank (Mission, Tx.). Mr. Frank said that he was representing Ms. Carr.He further stated that she was very upset, and she believed that she needed to be transferred now. She will pursue administrative or civil action. In the best interest of all and to expedite case it would  be best if she gets transferred, so that the case can be settled faster.Ms. Carr was consulted to verify that Mr. Frank was indeed representing her. Ms. Carr acknowledge to her supv. that he was representing her.

On 10/25/93 Ms. Carr came in and said that she wanted to be detailed to another port because she felt uncomfortable and since nothing was being done about her sexual harassment complaint. I advised her that the investigation was continuing and that the case was still pending.I further stated that we could probably not honor her request for a detail since their being separate from each other as we had designed it was sufficient and we could not justify a detail to another port and incur additional cost to the government.

On 10/20/93 I spoke to Ms. G. Cornelius, EEO counselor.She was proposing to settle case by honoring Ms. Carr's request for a transfer to San Antonio. I advised her that the District Director would make that decision and that a transfer to San Antonio was not feasible since it was a  different district.Ms. Cornelius added that the Ms. Carr was not willing to transfer to Laredo when posed the question of the possibility that the Dist. Dir. would consider

27. Page 2 of 3 pages
Form 5991-A (Rev. 6-81)

Deponent's Initials:

Department of the Treasury - Internal Revenue Service

68

| AFFIDAVIT | State of *Texas* | County of *Cameron* |
|---|---|---|

the possibility of a transfer to Laredo since it was in the same District.Note: When Ms. Carr originally came to the port Ms. Carr advised me that her parents resided in San Antonio.

As for the question of other sexual harassment complaints at the port, I am aware of a couple of allegations made in the past at the port, within the last five years.Both cases were resolved informally.

As for the open door policy,eventhough she is not singling me out, I don't know if she may have interpreted it as a closed door when we briefly discussed her detail request on 10/25/94.During that meeting she came in unannounced  a few minutes before a formal audit of an area at the port.I could only talk to her very briefly, and at no time did I close the door on her in any way shape or form. I am not aware of anybody else doing same.Note:All of my meetings with employees are coordinated through my secretary, due to the fact that my daily schedule is extremely busy due to the complexity of the operation and the size of the Port of Entry, which encompasses three border bridges, two airports, a seaport,an intl.railroad,whses,Foreign Trade Zone, etc.I am always willing to talk to employees provided that I have the time and that I prefer to be contacted prior to meeting. Ms. Carr talked to several managers and attempted to discuss the same case over and over,repeating the same thing and insinuating that nothing was being done about the case, when indeed the case was following its due course.

When the EEO counselor attempted to settle the case I was just provided bits and pieces about the case.I did not have the reports of the full investigation.It is difficult to settle a case when I don't have all of the facts of the case.

To the best of my recollection Gus Saldivar was notified a couple of days after Ms. Carr filed the complaint.I am not certain but I believe the Passenger Control  Chief (Mr. Ruedas) notified him .

Mr. Saldivar has not been disciplined because the investigation by Internal Affairs and EEO are still ongoing.Discipline will be administered when all of the evidence is in to avoid a double jeopardy disciplinary situation.

I believe that Int. Affairs may have already sent the reports of Investigation to LER in Region.I do not the outcome of findings at this moment.

I have read the above statement, consisting of ___3___ pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

*(Deponent's Signature)*

Subscribed and (sworn to) (affirmed)

before me at *1500 E. Elizabeth, Brownsville, Texas 78520*

on this __27__ day of *Janury*, 19 *94*

*(Investigator's Signature)*

69

| AFFIDAVIT | State of<br>TEXAS | County of<br>CAMERON |
|---|---|---|

1. I, EUTIMIO RUEDAS *ER* , (employed by the U.S. CUSTOMS SERVICE
   (If employed by agency involved in complaint))

2. as (Title and grade of position) a Chief Inspector, GS-13, at the Brownsville, TX Port of Entry,

3. state: that my official relationship to Ms. CARR at the time of the September 1993

4. incident was that of Acting Port Director.  I started my career with Customs in

5. 1971, as a Sky Marshal in Houston, Texas.  I was transferred to the Port of Hidal-

6. go, Texas in 1973, as an Inspector, and in 1976, I was moved to the Brownsville POE.

7. In 1985, I became a Customs Supervisor and was promoted to Chief Inspector in 1990.

8. My gender is male and I have been interviewed twice in an EEO Complaint Process.

9. Based on what I know, the incident between Mr. SALDIVAR and Ms. CARR did happen.

10. I do not believe it was sexual harrassment.  I believe it was a cordial exchange

11. of a greeting which resulted in a kiss that she did not expect.)  In the past, they

12. would greet each other warmly, with small hugs between each other at employee gat-

13. herings.  This incident started out innocently enough but resulted into something

14. that was unwarranted and uncalled for.  I think Mr. SALDIVAR did not think that she

15. would file a complaint on his actions.  I was Mr. SALDIVAR's second-line supervisor

16. at the time of the incident.  To my knowledge, no one else has complained about Mr.

17. SALDIVAR with  regards to Sexual Harassment.  I have never heard him make any sug-

18. gestive comments to other employees.  On Friday, September 17th, Ms. Carr came look-

19. ing for the Port Director after 5 pm.  At first she did not want to to talk to me,

20. once I informed her that Mr. FLORES would not be back until Monday, she told me of

21. the incident with Mr. Saldivar at the Brownsville Airport workstation that occurred

22. the day before.  I asked her if she was making a complaint so that I could report

23. it to Internal Affairs.  She said that she would rather wait to talked to Mr. FLORES

24. because she wanted a solution right away and that she wanted a transfer out of here

25. with no specific place discussed.  Ms. CARR said that she rather keep the incident

26. in-house and talk to Mr. FLORES, but that if she did not get want she wanted that

27. Page 1 of 4 pages          Deponent's Initials; *ER*          63

| **AFFIDAVIT** | State of    **TEXAS** | County of    **CAMERON** |
| --- | --- | --- |

1. she would make it big and ugly.  She also said that she knew I and Mr. SALDIVAR were

2. hunting buddies and that nothing would probably happen to him from this incident.  I

3. tried to get a hold of Mr. FLORES but I could not reach him.  On Monday morning, I met

4. with Mr. FLORES and discussed the incident with him behind closed doors prior to CARR.

5. Ms. CARR has never complained to me about any other harassments while she has been here

6. at the Port.  About 4-5 years ago, two incidents took place based on sexual harassment

7. involving four different employees and they were resolved informally.  It did not involve

8. the people in this case.  Personally, I do not know if Internal Affairs has concluded

9. its investigation.  I know the incident was reported to Internal Affairs, but I have not

10. been interviewed by Internal Affairs personnel.  As a second-line supervisor, I would

11. not necessarily know of the investigation.  Ms. Carr did not furnish any typed out

12. notice, I know that she did furnish a typed note to Mr. FLORES requesting that only

13. Internal Affairs and the Office of EEOC be informed of the incident after conferring

14. with an EEO Investigator from the Dallas office who was conducting another inquiry.

15. On Monday, Mr. FLORES called the Regional EEO office in Houston and spoke to DAVID

16. GARZA's office and told him to keep the two employees apart and not to inform Mr.

17. SALDIVAR about the complaint against him, and that an EEO counselor would be coming

18. to Brownsville as soon as it could be arranged.  I knew that Mr. SALDIVAR was going

19. to be at the Firearms Range which is outside of the city limits that week, and Ms.

20. CARR was assigned to the Cargo Section, so there would be no chance of meeting.  In the

21. morning, Mr. SALDIVAR, came in to get the range supplies and to load up the government

22. vehicle near the Cargo Office and then went into the main building to sign-in and ran

23. into Ms. CARR somewhere in between and shook her hand good morning.  This incident then

24. caused Ms. Carr to call the District Office in Laredo to report that Mr. SALDIVAR had

25. held her hand.  Yet Mr. SALDIVAR was unaware of the fact that she had complained about

26. the incident on September 16, 1993.  With regards to the reprisal allegations, Ms. CARR

| AFFIDAVIT | State of TEXAS | County of CAMERON |
|---|---|---|

1. never came to me to discuss the sexual harrassment case, so I did not do any of these

2. actions against her.  Mr. FLORES and Mrs. GREENE both told me that they had met with

3. Ms. CARR and that she was trying to find out why it was taking so long to handle her

4. case and to find out about her requested transfer out of Brownsville.  Mr. FLORES nor

5. Mrs. GREENE could not tell her anything because the Regional EEO office and District

6. LER office had advised not to discuss the pending case with her.  Mr. FLORES also said

7. that Ms. CARR's lawyer called him wanting to discuss the case with him, but he said he

8. could not and referred to the Regional EEO office.  The lawyer said that Ms. CARR wanted

9. a transfer only to San Antonio, Texas.  From what I understand, the attorney is out of

10. McAllen, Texas and his is Black.  Ms. CARR had mentioned of going to the NCAAP for help.

11. Mr. FLORES should have noted his name and telephone number.  I do not recall seeing any

of the type of actions of reprisal as stated by Ms. CARR being done by either Mr. FLORES,

13. Mrs. GREENE, or other Port managers.  First, we could not discuss the case with her be-

14. cause the Regional EEO office was in the process of conducting the informal inquiry,

15. and second, we have no authority in providing employee post of duty transfers.  The type

16. of services that fall under the EAP Program are job stress, emotional problems, family

17. and marital difficulties, financial problems, etc.  There are periodic publications on

18. the program and the service provides training on it once in a while.  It is for problems

19. both on or off the job.  I can provide a copy of an EAP information related document.

20. I have referred employees to the EAP counselors.  Just recently, in November, I advised

21. an employee to contact EAP for a problem dealing with job stress.  We have also referred

22. a supervisor to the EAP in recent years.  The referrals are made on a case by case basis.

23. We did make arrangements for Mr. SALDIVAR not to be at the range when Ms. CARR was going

for qualifications.  Customs does have a policy on Sexual Harassment and we get training

25. on it once a year.  Memos on Sexual Harassment are circulated pretty regularly also.

26.

1. From what I understand, Mr. SALDIVAR, has not received any disciplinary action
2. at this time. I am not sure why he has not and what the status is on pending
3. discipline. I am basically not directly involved with this incident and there-
   fore that is why I do not know where or at what stage this case is at. I would like
4. to add that Mr. SALDIVAR is bound to comply with the Customs Service's Policies
5. and Procedures Manual entitled Conduct and Employees Responsibilities and is
6. subject to discipline as prescribed in the Servicewide Table of Offenses for
7. violations thereof, if warranted, after due process under Customs LER guidelines.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.

I have read the above statement, consisting of ____4____ pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

E. Rueda

*(Deponent's Signature)*

Subscribed and (sworn to) (affirmed)

before me at 1500 E. Elizabeth Brownsville, Texas 78520

on this 24 day of January, 19 94

*(Investigator's Signature)*

66

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | **AFFIDAVIT** |
| COUNTY OF HIDALGO | § | |

I, **DOMINGO TAMEZ, JR.**, being of sound mind and body and over eighteen (18) years of age do hereby state the following:

"On October 23, 1995 at approximately 7:15 a.m., I saw Inspector Charlene Carr on Secondary. I saw that Inspector Carr was wearing what I believe to be ear plugs. I asked Carr what was the reason for wearing ear plugs? She told me that they were not ear plugs. Inspector Carr told me she was listening to music and jamming. Since wearing either ear plugs or listening to a radio while on the job constitutes a safety hazard, I felt compelled to determine the facts prior to reporting her to a supervisor. I then questioned her and told her "No, they look like ear plugs to me". She then began to laugh and continued dancing and said "No, I'm jamming". Ms Carr then told me. "Check it out". I then got closer to her and checked to see if she was indeed listening to a radio. Note: While on Secondary, within view of the general public (oncoming morning traffic) and other inspectors working in the immediate area, I lightly tapped Inspector Carr's back neck area to see if she had a wire running from the ear plugs onto a radio. Inspector Carr was wearing a uniform jacket. Throughout all this time Inspector Carr was giggling and laughing out loud - claiming to be jamming. I then left. I recall that afterwards I told Supervisor Maria Elena Reyes that Inspector Carr was working Secondary with ear plugs on.

At no time did I offensively touch Inspector Carr."

Further, Affiant sayeth not.

SIGNED on this the _8th_ day of _November_, 1995.

_Domingo Tamez, Jr._

**DOMINGO TAMEZ, JR.**

**SUBSCRIBED AND SWORN TO BEFORE ME** on this the _8th_ day of _November_, 1995, to which witness my hand and official seal.

_Janie Bales_

Notary Public, State of Texas

My Commission Expires: _4.04.98_